SUTHERLAND–INNES CO., Limited, v. VILLAGE OF EVART.

(Circuit Court of Appeals, Sixth Circuit. April 5, 1898.)

No. 552.

1. TAXATION—PURPOSES.
   In the absence of special enabling provisions in the constitution of a state, taxation is permissible only for public purposes.

2. MUNICIPAL CORPORATION—OBLIGATIONS—MEANS OF PAYMENT.
   Where there is no special fund for payment of a municipal obligation, a resort to taxation is implied; hence the power of a municipal corporation to contract is limited by the purposes for which taxes may be levied.

3. SAME—ASSISTANCE OF PRIVATE BUSINESS.
   A contract by a municipal corporation to encourage the establishment and operation within its limits of a private manufacturing establishment is not for a public purpose, and is therefore beyond the power of such municipality; and legislation authorizing such contracts is void, in the absence of express constitutional authority.

4. STATE STATUTES—CONSTRUCTION AND VALIDITY—FEDERAL COURTS.
   It is the duty of the federal courts to accept the decisions of the highest courts of a state upon the construction of a state statute and its conformity to the state constitution, when rights acquired upon the faith of the statute or earlier decisions are not involved.

In Error to the Circuit Court of the United States for the Western District of Michigan.

This is an action at law against defendant in error, a municipal corporation, created under the laws of Michigan, to recover damages for the breach of a contract in failing and refusing to maintain a fire hydrant, as required by the contract sued on. The contract was between defendant in error and C. E. Fenton, and subsequently assigned by Fenton to plaintiff in error, said Fenton having sold to plaintiff in error the mill property, for the benefit of which the contract was executed. It is agreed that the contract is correctly set out in the declaration, as follows: "Whereas, Clarence E. Fenton, of Linwood, Bay county, Michigan, is the owner of a mill and the necessary machinery for the manufacture of staves and heading for slack barrels, which he proposes to move to Evart, Osceola county, Michigan, on the Main Muskegon river, and to erect, equip, and operate said mill in the village of Evart, aforesaid, and to employ what would be equal to fifteen men ten months in the year for the term of five years, and to produce timber for the purpose of manufacture in said mill; and whereas, the village of Evart, Osceola, Michigan, being desirous of obtaining the location within its boundaries of a stave and heading mill, for the purpose of giving employment in part to the citizens and creating a market for the sale of timber for the inhabitants of the surrounding county, thereby putting money in circulation by the employment of the labor and purchase of timber, and thus adding to the purchasing power of its and the surrounding country's inhabitants, thereby increasing the general prosperity of the village and its citizens: Now, therefore, it is agreed between the village of Evart, Osceola county, Michigan, of the first part, and Clarence E. Fenton, of Linwood, Bay county, Michigan, of the second part, as follows: The first agrees that it will place and maintain a fire hydrant within a reasonable distance of a mill building hereafter to be built, and furnish water for the fire protection free during the term of the operation of said mill, and will also give to the aid of said second party to in part reimburse him for the cost of tearing down and removal from Linwood, Mich., to Evart, Mich., and rebuilding and putting up the aforesaid stave and heading mill, and the machinery necessary to successfully operate the same,

the sum of seventeen hundred dollars, the same to be paid as follows: Seven hundred dollars when the mill plant is completed and in operation, and one thousand dollars to be paid in a village order to be delivered to second party when said mill plant is completed and in operation, said order to be made payable on or before August 15, 1893. Said second party, in consideration of the above agreements, agrees that he will remove said mill and machinery to the village of Evart within ninety days from this date, and locate and put said mill in operation during the present year, and will manage same so as to give employment to what would equal fifteen men ten months in the year for five years from the date of putting in operation of said mill, and further agrees by himself, his heirs or assigns, to maintain, keep in repair, and operate such stave and heading mill for the manufacture of staves and heading for slack barrels, and containing all the machinery necessary to successfully manufacture the same, and will not remove from Evart, or cause the same to be done, said mill during the term of five years; and it is hereby expressly agreed and understood that, in case of default in [any] of the agreements to be performed by the second party, the first party shall be entitled to receive from the second party or his heirs, in an action for moneys had and received, a sum for the unearned time remaining after the violation of this agreement, in proportion as seventeen hundred dollars is to five years; and that the money advanced by the said village of Evart shall constitute a lien in proportion to the unearned time as against the removal of the said mill from the said village of Evart for the period of time as herein specified; and that the mill is unincumbered." It is averred that Fenton and plaintiff in error, to whom the contract was assigned, have duly performed the contract on their part. The defendant in error paid the $1,700 bonus, and continued for a time to maintain the hydrant as stipulated, but finally ceased and failed to do so. The mill, machinery, and contents were afterwards destroyed by fire. It is alleged that the fire was promptly discovered, and could have been extinguished except for the defendant's failure to furnish fire protection by maintaining the hydrant. In consequence of this violation of the contract, $19,000 is claimed as damages for the loss. The declaration was demurred to upon the grounds, among others, that the contract sued on was void, because not authorized by the charter of the village of Evart or by the laws of Michigan, and was without consideration. The court sustained the demurrer, holding that the contract was ultra vires and without consideration. Final judgment was accordingly entered dismissing the suit, and, to review that judgment, this writ of error is brought.

S. E. Engle, for plaintiff in error.
C. H. Rose, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

CLARK, District Judge, after stating the case, delivered the opinion of the court.

Two questions arise on this record: First, whether or not, under the charter of the appellee or the general provisions of the Michigan statutes in relation to corporations of this class, the appellee was invested with power to make the contract here in question; and, second, whether or not this charter and the general statutes upon the subject construed as conferring power to make this contract would be valid under the constitution of Michigan.

We prefer to deal first with the question whether or not a charter or statute conferring upon the village of Evart power to make a contract like that now in question would be valid under the constitution of Michigan, for it depends upon the proper disposition of that question whether the case will require any inquiry into the question whether, upon a proper construction of the charter or laws of Michigan,

the power to make this contract is conferred.    It is to be observed in the outset that, as this action is one upon a specific contract to recover damages for breach of that contract, we are not concerned with the consideration of any question relating to the governmental or public duty of the appellee in regard to fire protection, nor with any question of negligence in respect of such duty.    Admittedly, the only consideration which supports this contract, and the only purpose for which it was made, was the establishment and operation for the period named of the stave and heading mill, and the indirect advantages to result to the inhabitants of the village thereby.    Unless that contract as made was valid, no obligation was incurred by the village of Evart, and no suit upon the contract could be maintained.    It is undoubtedly true, as a general proposition, that, where the construction or validity of a state statute does not involve rights acquired upon the faith of the statute or earlier decisions, it is the duty of federal courts to accept the decisions of the highest courts of the state in regard to the construction of state statutes and the conformity of such laws to the constitution of the state, those courts being the appropriate tribunals for the determination of such questions.    Sanford v. Poe, 37 U. S. App. 378, 16 C. C. A. 305, and 69 Fed. 546; Louisville Trust Co. v. City of Cincinnati, 47 U. S. App. 46, 22 C. C. A. 534, and 76 Fed. 296; Forsyth v. City of Hammond, 166 U. S. 506, 17 Sup. Ct. 665; Telegraph Co. v. Poe, 64 Fed. 9; Long Island Water-Supply Co. v. City of Brooklyn, 166 U. S. 685, 17 Sup. Ct. 718; Merchants' & Manufacturers' Nat. Bank v. Pennsylvania, 167 U. S. 461, 17 Sup. Ct. 829. There is nothing in this case to bring it within any of the recognized exceptions to the rule.    If, then, the decisions of the highest court of the state of Michigan furnish a rule by which to dispose of the question here raised, the decisions of that court are controlling.

As counsel in the case differ as to the proper conclusion to be drawn from the decisions of the supreme court of Michigan in their application to the case at bar, it will materially aid in understanding and applying those decisions to examine and restate the generally established doctrine upon the subject.    In the absence of special enabling provisions in the constitution of a state, the levy of a tax or the appropriation of revenue derived from taxation is permissible only for a public purpose or object, and legislative power is limited accordingly.    And in the ordinary case of municipal obligation, in whatever form incurred, in the absence of a fund specially provided otherwise, a resort to taxation to satisfy such obligation is implied.    It is upon this principle, therefore, that the power to contract on behalf of such corporation must be limited by the objects and purposes for which taxes may be laid and appropriated when collected.    That this must be true in a general sense cannot admit of question, for otherwise the anomalous result would, in effect, be to recognize the power to incur the obligation while denying the only power by which the obligation could be satisfied.

In Tied. Mun. Corp. § 254, it is said:

"The levy of a tax is only permissible, except under tyrannical government, when it is made for a public purpose, and it is proportioned uniformly among the subjects of taxation.    When the tax is imposed for some private or individual benefit, or it is not uniformly imposed upon those who ought to bear it, it is perfectly proper, nay it is the duty of the courts, to interfere and prohibit

what may be justly called an 'extortion.' * * * But, if the purpose be truly private,—if the tax in effect takes the property of one man, and gives it to another,—it is illegal, and it is the duty of the courts to enjoin its collection. For example, it has been held unlawful to levy taxes in aid of manufacturing and other private industrial enterprises, for the relief of farmers whose crops have been destroyed, to supply them with seeds and provisions, or for making loans to persons whose homes have been destroyed by fire. It has also been held illegal to pay a subscription to a private corporation which is to be devoted to a private purpose."

· And in section 188 the principle is thus stated:

"The policy of our laws is against any species of paternalism by which the state, or any of its component parts, shall become a partner in any private industry, however important or beneficial that business may be; and bonds issued for such purposes are ipso facto void, and neither the payment of interest nor the acts of the city officials operate, by way of estoppel, to render the corporation liable on such obligations."

In the leading case of Loan Ass'n v. Topeka, 20 Wall. 655, the action in the court below was upon coupons for interest attached to bonds of the city of Topeka, issued, as appeared upon their face, pursuant to an act of the legislature of Kansas, to a manufacturing corporation, to aid it in establishing shops in the city of Topeka for the manufacture of iron bridges; and these bonds were held void even in the hands of a purchaser in good faith and for value. The single question considered and determined by the court was the authority of the legislature of the state of Kansas to enact that part of the statute which authorized the bonds. Mr. Justice Miller, delivering the judgment of the court, said:

"If these municipal corporations, which are in fact subdivisions of the state, and which for many reasons are vested with quasi legislative powers, have a fund or other property out of which they can pay the debts which they contract, without resort to taxation, it may be within the power of the legislature of the state to authorize them to use it in aid of projects strictly private or personal, but which would, in a secondary manner, contribute to the public good; or where there is property or money vested in a corporation of the kind for a particular use, as public worship or charity, the legislature may pass laws authorizing them to make contracts in reference to this property, and incur debts payable from that source. But such instances are few and exceptional, and the proposition is a very broad one that debts contracted by municipal corporations must be paid, if paid at all, out of taxes which they may lawfully levy, and that all contracts creating debts to be paid in future, not limited to payment from some other source, imply an obligation to pay by taxation. It follows that in this class of cases the right to contract must be limited by the right to tax, and if, in the given case, no tax can lawfully be levied to pay the debt, the contract itself is void for want of authority to make it. If this were not so, these corporations could make valid promises, which they have no means of fulfilling, and on which even the legislature that created them can confer no such power. The validity of a contract which can only be fulfilled by a resort to taxation depends on the power to levy the tax for that purpose. It is therefore to be inferred that, when the legislature of the state authorizes a county or city to contract a debt by bond, it intends to authorize it to levy such taxes as are necessary to pay the debt, unless there is in the act itself, or in some general statute, a limitation upon the power of taxation which repels such an inference."

The court, after pointing out that municipal loans or aid voted to railroads by counties and towns had been the subject of contest and discussion in almost every state in the union, further observed:

"We have referred to this history of the contest over aid to railroads by taxation, to show that the strongest advocates for the validity of these laws never placed it on the ground of the unlimited power in the state legislature to tax

the people, but conceded that where the purpose for which the tax was to be issued could no longer be justly claimed to have this public character, but was purely in aid of private or personal objects, the law authorizing it was beyond the legislative power, and was an unauthorized invasion of private right."

And in respect to what may be regarded as a public object, for which liability may be incurred by contract to be satisfied by taxation, the court used this language:

"We have established, we think, beyond cavil, that there can be no lawful tax which is not laid for a public purpose. It may not be easy to draw the line in all cases so as to decide what is a public purpose in this sense and what is not. * * * But in the case before us, in which the towns are authorized to contribute aid by way of taxation to any class of manufactures, there is no difficulty in holding that this is not such a public purpose as we have been considering. If it be said that a benefit results to the local public of a town by establishing manufactures, the same may be said of any other business or pursuit which employs capital or labor. The merchant, the mechanic, the innkeeper, the banker, the builder, the steamboat owner, are equally promoters of the public good, and equally deserving the aid of the citizens by forced contributions. No line can be drawn in favor of the manufacturer which would not open the coffers of the public treasury to the importunities of two-thirds of the business men of the city or town."

This case has been repeatedly followed, and its doctrine reaffirmed in subsequent decisions of the supreme court of the United States, and in the courts of highest authority in the states. It is to be noted that the decision in this case did not proceed upon the ground that there was any specific restriction in the constitution of Kansas in the way of the legislative act under which the bonds were issued. The judgment rested upon the broad ground that under a general grant of legislative power, and in the absence of specific provision in the constitution, the legislature was without power to authorize the issue of bonds to be satisfied by taxation, except for a strictly public purpose, and that the object for which the bonds in question were issued was not a public use, and that such was the view is made manifest in the dissenting opinion of Mr. Justice Clifford. It was in reference to this broader proposition that the court said, in effect, that there are limitations of power on all branches of government, state and national, arising out of the very nature of free governments, and that among such limitations of power was the one in respect to the right of taxation; that it could only be used in aid of a public purpose for which governments are established.

In City of Parkersburg v. Brown, 106 U. S. 487, 1 Sup. Ct. 442, the question raised was in regard to the validity of bonds issued under authority of an act of the legislature of West Virginia, for the purpose of lending the same to persons engaged in manufacturing, and it was again held that the bonds were invalid. Among various defenses set up in the answer by the city to the bill, it was insisted that it was in excess of the constitutional power of the legislature of the state to authorize taxation for the purpose of paying the bonds, unless that power was clearly conferred on it by the constitution of the state, and that no such power was conferred by the constitution of that state. This view was sustained upon the authority of Loan Ass'n v. Topeka, and the doctrine of that case, in its broadest statement, reaffirmed.

See, also, City of Ottawa v. Carey, 108 U. S. 110, 2 Sup. Ct. 361,

in which, although the question on which the case turned was whether authority to issue the bonds had been granted by the legislature, the general reasoning of the opinion is applicable.

In Cole v. City of La Grange, 113 U. S. 1, 5 Sup. Ct. 416, bonds had been issued under authority of an act of the legislature of Missouri, authorizing the city to issue its bonds by way of donation to a private manufacturing corporation, and the action was to recover the amount of coupons for interest for a stated time. The issue of the bonds was regular, and in exact accordance with the requirements of the statute, and the only question in the case was the validity of the act. The grant of legislative power in the constitution of Missouri was in the usual general terms by which that power is defined, there being no enabling or special provision under which the legislature could have acted. Mr. Justice Gray, speaking for the court, said:

"The general grant of legislative power in the constitution of a state does not enable the legislature, in the exercise, either of the right of eminent domain, or of the right of taxation, to take private property, without the owner's consent, for any but a public object. Nor can the legislature authorize counties, cities, or towns to contract, for private objects, debts which must be paid by taxes. It cannot, therefore, authorize them to issue bonds to assist merchants or manufacturers, whether natural persons or corporations, in their private business. These limits of the legislative power are now too firmly established by judicial decisions to require extended argument upon the subject. In Loan Ass'n v. Topeka, 20 Wall. 655, bonds of a city, issued, as appeared on their face, pursuant to an act of the legislature of Kansas, to a manufacturing corporation, to aid it in establishing shops in the city for the manufacture of iron bridges, were held by this court to be void, even in the hands of a purchaser in good faith and for value. A like decision was made in City of Parkersburg v. Brown, 106 U. S. 487, 1 Sup. Ct. 442. The decisions in the courts of the states are to the same effect. Allen v. Inhabitants of Jay, 60 Me. 124; Lowell v. City of Boston, 111 Mass. 454; Weismer v. Village of Douglas, 64 N. Y. 91; In re Application of Eureka Basin Warehouse & Mfg. Co., 96 N. Y. 42; Bissell v. City of Kankakee, 64 Ill. 249; English v. People, 96 Ill. 566; Railroad Co. v. Smith, 23 Kan. 745."

This is an instructive case.

In Scotland County Court v. U. S., 140 U. S. 41, 11 Sup. Ct. 697, the court held that when, at the time of issue of bonds, there existed a power of taxation sufficient to pay the bonds and interest, such power entered into and formed a part of the contract, and could not be taken away by subsequent legislation. The relation between the power to tax and the power to contract was referred to by the court in this language, being taken from the opinion of the court in Ralls County Court v. U. S., 105 U. S. 733:

"The power to tax is necessarily an ingredient of such a power to contract; as, ordinarily, political bodies can only meet their pecuniary obligations through the instrumentality of taxation."

See, also, U. S. v. City of New Orleans, 98 U. S. 381.

The house of representatives of Massachusetts (Opinion of Justices, 155 Mass. 601, 30 N. E. 1142) submitted to the justices of the supreme judicial court of that state the question whether power might be conferred on cities and towns to buy and sell coal and wood for fuel to the inhabitants of the cities and towns. The justices, first stating that the proper answer depended on the question whether such a business could be regarded as a public object, said:

"This inquiry underlies all the questions on which our opinion is required. If such a business is to be carried on, it must be with money raised by taxation. It is settled that the legislature can authorize a city or town to tax its inhabitants only for public purposes. This is not only the law of this commonwealth, but of the states generally and of the United States. The following are some of the decisions or opinions on the subject: Lowell v. City of Boston, 111 Mass. 454; Mead v. Inhabitants of Acton, 139 Mass. 341, 1 N. E. 413; Opinion of Justices, 150 Mass. 592, 24 N. E. 1084: Kingman v. City of Brockton, 153 Mass. 255, 26 N. E. 998; Loan Ass'n v. Topeka, 20 Wall. 655; City of Ottawa v. Carey, 108 U. S. 110, 2 Sup. Ct. 361; Cole v. City of La Grange, 113 U. S. 1, 5 Sup. Ct. 416; Allen v. Inhabitants of Jay, 60 Me. 124; Opinion of Justices, 58 Me. 590; Attorney General v. City of Eau Claire, 37 Wis. 400; State v. City of Eau Claire, 40 Wis. 533; State v. Osawkee Tp., 14 Kan. 418; Mather v. City of Ottawa, 114 Ill. 659, 3 N. E. 216."

A railroad corporation obtains its franchises largely because of its public importance, and is consequently often called a "quasi public corporation." It is the one great method of modern travel, of carrying on commerce, of communication by mail, and the chief means of moving crops and other products, and essential to the successful operation of all industrial establishments. On these and other grounds which might be enumerated, a railroad may be and has been held so far a public object as to justify municipal aid. But these reasons can obviously have no application to a private mill like the one now in question, and no justification, upon principle or authority, can be found for municipal aid by contract to such an enterprise. When the legislature has authorized the issue of bonds by a municipal corporation or other contract obligation, for an object which must be considered private as distinguished from public in the legal sense, it is not sufficient to uphold such legislation as valid that no restrictive provision in that regard is found in the constitution. The authority to enact such legislation must affirmatively appear. This must be accepted as the result of these and other cases that might be referred to. As is well known, there has been much discussion and some conflict in the decisions over the question whether a municipal corporation, under legislative authority, may aid, by taxation, the construction of a railroad. In all such cases the decision has been made to turn upon whether such a purpose was public. The legislation in such cases authorizing such aid was held valid or invalid, as the courts concluded that the object was a public or a private one. A great preponderance of authority is in favor of the proposition that such an object is public. The decisions of the supreme court of Michigan, however, clearly establish the doctrine for that state that the construction and operation of a railroad is not a public purpose, in aid of which a municipal corporation may be authorized to pledge its credit or issue bonds. People v. Township Board of Salem, 20 Mich. 452; People v. State Treasurer, 23 Mich. 499; Thomas v. City of Port Huron, 27 Mich. 320. The provisions of the constitution of Michigan, so far as they affect this question, will be found sufficiently referred to in these cases, and need not be recited now.

In People v. Township Board of Salem, 20 Mich. 452, the judges delivered separate opinions. Cooley, J., said:

"But, if the legislature should pass an act providing that the township of Salem should give or loan a certain percentage of its taxable property to any mer-

chant who will undertake to erect a store within the township, and hold himself ready at all times to sell goods therein to the people of the township on terms as favorable as those he would exact from others, he would be a bold man who should undertake to defend such legislation on constitutional principles. Yet the case would possess all the elements of public interest which are to be found in the case before us. The public convenience would be subserved, and there would be a like tendency to increase local values. The difference in the cases would be in degree, and not in kind; and it would be easy to suggest enterprises as to which the comparison, even in degree, would not be to the advantage of the railroad. And when we have once determined that a municipal government can tax its citizens to make a donation to a railroad company, because of the incidental benefits expected from its operation, we do not go a single step further when we hold that it may use the public funds to erect a cotton or woolen factory, or a building suited to the manufacture of tobacco, and present it on grounds of public benefit, to any person who will occupy it."

In regard to the power of taxation, Chief Justice Campbell said:

"It cannot be claimed that there is no limit to the power of taxation, which can prevent the imposition of taxes for all purposes which the legislature may choose. There are purposes the illegality of which would be so manifest that, although not mentioned in any constitution, no one could hesitate to say the burden was not validly imposed to further them. The purposes for which taxes are imposed must be public purposes, and, however close some things may be to the dividing line, yet, whenever any subject lies clearly on one side or the other, the courts must sustain or reject the tax accordingly, whether the purpose be laudable or not."

The general doctrine announced was that the exercise by a municipal corporation of the power to pledge its credit was the incipient step in the exercise of the power of taxation, and that unless the object to be promoted was such as might be provided for by taxation, the power to make the pledge or incur the obligation did not exist, and that the legislature could not confer such power. The doctrine that the contract power and the power of taxation are equally limited to a public object or purpose is a clear implication in these cases. It would seem to be obvious enough that if a municipal corporation is without power to contract an obligation by a pledge of its credit, or the issue of bonds, it is equally without power to accomplish the same result indirectly by the execution of a contract on which judgment may be rendered against the corporation for damages to be satisfied only by taxation. The only difference which could be suggested relates merely to form, and to the differences between a direct and indirect method of incurring an obligation which does or may require a resort to the power of taxation.

The purpose of the contract in question, as appears on its face, was to encourage the establishment and operation in the village of Evart of a private business, and the object was clearly not a public one. We think it is manifest that if the charter of the village of Evart, or any general statute defining the powers of municipal corporations of that class upon a proper construction, could be regarded as conferring power to make a contract of this character, the legislation would be invalid under the constitution of Michigan. As this view of the case furnishes sufficient, and we think undoubted, ground for sustaining the judgment of the court below, we do not find it necessary to inquire into the construction of the legislation with a view to ascertaining whether the power is conferred. Judgment affirmed.